**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
RACHEL GALLANT,                         )
                                        )
        Plaintiff,                      )
                                        )        **Civil Action No.**
        v.                              )        **13-12081-FDS**
                                        )
BOSTON EXECUTIVE SEARCH                 )
ASSOCIATES, INC., and PHILIP G.         )
MORIMOTO,                               )
                                        )
        Defendant.                      )
_____)

**MEMORANDUM AND ORDER ON**
**CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, J.**

This action arises out of an employment termination.  Jurisdiction is based on diversity of citizenship.  Plaintiff Rachel Gallant has brought suit against defendants Boston Executive Search Associates, Inc. ("BESA") and Philip G. Morimoto, alleging claims for violation of the Massachusetts wage law, breach of fiduciary duty, breach of contract, and promissory estoppel.

The parties have filed cross-motions for partial summary judgment.  For the following reasons, the motions will be granted in part and denied in part.

## I.     Background

### A.     Factual Background

#### 1.     BESA and Morimoto

BESA is a Massachusetts corporation with a principal place of business in Cambridge, Massachusetts.  (Morimoto Aff. ¶¶ 1-2).  It is a legal recruiting firm that specializes "in lateral partner placements into top-tier regional, national, and international law firms."  (Morimoto Aff.

¶ 2).

Philip Morimoto is the founder, president and sole shareholder of BESA.  (*Id.* ¶ 1).  He resides in Somerville, Massachusetts.  (*Id.* ¶ 1).  He has worked in the legal recruiting industry for more than 12 years.  (*Id.*).

BESA employs legal recruiters to

> identify and evaluate qualified candidates for lateral partner positions, work with those candidates to understand their career ambitions, develop relationships with prominent law firms to understand their strategic growth objectives, determine appropriate matches between candidates and law firms, introduce the candidate to the law firm, coordinate the interview process, and serve as intermediary during the sometimes extended process until the candidate joins the firm as a partner.

(*Id.* ¶ 3).  When BESA places a lateral partner, it receives a commission for its services.  (*Id.* ¶ 4).

### 2.   **Hiring of Gallant**

Rachel Gallant has a law degree from the University of Memphis School of Law.  (Morimoto Aff. ¶ 9).  She worked as an attorney in Memphis until 2009.  (*Id.*).  In April 2010, Gallant contacted BESA while searching for employment as an attorney.  (*Id.* ¶ 8).  On May 5, 2010, Morimoto offered her a job at BESA.  The offer was set forth in an e-mail that stated as follows:

> I would like to offer you "employment at will" at [B]ESA at the rate of $4,750 per month with an additional $250 per month as a contribution to your healthcare coverage.  Commission will be at a rate of 20% of the gross fee if you recruit a candidate that we subsequently place with one of our clients.  Please note that commission is subject to the terms and conditions of our guarantees documented in the fee agreements we have with our clients.

> This offer is contingent upon favorable reference checks.  Please let me know if these terms are acceptable.  If so, please let me know which references I can call.

> We would be delighted to have you become part of [B]ESA.

(Defs.' SMF Ex. B).  Gallant replied to Morimoto's e-mail that same day.  (*Id.* Ex. C).  She

wrote, "[t]he terms are acceptable to me and I would love to work with [B]ESA.  I left you a

voicemail with my agreement as well."  (*Id.*).

At the time she was hired, Gallant understood she was hired as an at-will employee.

(Gallant Dep. 86:5-19).  She began working at BESA as a legal recruiter on May 10, 2010.

(Morimoto Aff. ¶ 12).  At that time, she received a salary of $4,750, a $250 contribution to her

healthcare, and 20 percent commissions of gross fees for any candidate whom she recruited who

was placed with one of BESA's law firm clients.  (Morimoto Aff. ¶ 13).

### 3.      Gallant's Compensation Terms and Title

During her tenure with BESA, the terms of Gallant's compensation and her title changed

on more than one occasion.  At some point after she was hired, BESA agreed to modify her

compensation so that in addition to receiving 20 percent commissions of gross fees for any

candidate for whom she recruited who was placed with one of BESA's law firm clients, she

would also receive 20 percent commission of the gross fees for any candidate who was placed

with a law firm client that she managed.  (Morimoto Aff. ¶ 14).

In an effort to "boost her marketing efforts," Gallant was given various job titles,

including Search Consultant, Legal Consultant, Partner Placement Consultant, Vice President of

International Markets, and Strategic Alliance Officer.  (Morimoto Aff. ¶ 41).[1]  In 2011, she was

named General Counsel of BESA.  (Gallant Opp. Aff. ¶ 1).  In that role, she contends that she

rendered legal advice, reviewed and negotiated contracts of various types, represented BESA in

---

[1] Gallant does not appear to address this fact in her "Statement of Material Facts in Dispute."  (*See* Pl.'s
SMF).  As a result, it is undisputed that she had these various titles, and that the purpose of giving her these titles
was to "boost her marketing efforts."  (Morimoto Aff. ¶ 41).

internal legal disputes, and interacted and collaborated with outside legal counsel for BESA. (*Id.*).  She continued to perform legal recruiting after she became General Counsel.  (*Id.*).

In January 2012, Gallant's base salary was changed to $3,250 per month and her commission was increased to 25 percent of the gross fee for candidates for whom she recruited and 25 percent of the gross fee for law firm clients that she managed.  (Morimoto Aff. ¶ 15).  As a result, she could receive up to 50 percent of gross fees received by BESA for law firm placements.  (*Id.*).[2]

### 4.  Discussions Concerning Possible Reorganization of BESA

In a September 25, 2012 e-mail to Kate Gascoigne, Morimoto stated that "it makes sense to reorganize [BESA] as a partnership and appoint [Ms. Gascoigne] as an equity partner." (Gallant Opp. Aff. Ex. A).  In the e-mail, Morimoto stated that

> people can become equity partners by:  being off salary for a minimum of three years, consistently generated revenue as lead client manager, regularly recruiting candidates we place, regularly managing and closing deals, tenure at [BESA] of more than five years, earning non-equity partnership status through being part of over [$]1 [million] in [BESA] deal work . . . , and earning a minimum of 5 percent before eligible for equity status[,] being part of [$]5 [million] in deals . . . .

(*Id.*).  The e-mail went on to state that "[n]on-equity partners must have earned 1 point/percent by being part of deals generated [$]1 [million] in revenue in a calendar year—if thi[s] happens, they have earned a partner title and are income partners at [BESA].  Rachel [Gallant] would be a

---

[2] Gallant contends that her "most recent employment terms" are set forth in an e-mail dated January 10, 2012 to Nicholas Howard, BESA's chief financial officer.  (Gallant Aff. ¶ 4; *see* Defs.' Opp. 4).  In that e-mail, which bears the subject "My new payroll information for 2012," she stated that "Phil [Morimoto] and I have agreed that my payroll information will change in 2012 to the following:  $3,250/month in salary[;] $250/month health insurance reimbursement[; and] 25% on my deals for each side."  (*Id.* Ex. B).

partner with one or two points." (*Id.*).[3] A subsequent e-mail dated October 5, 2012, from Morimoto to Gascoigne, stated that "I will bring the reality of your status as full partner of [BESA] to [Gallant's] attention next week . . . ." (Gallant Opp. Aff. Ex. A)

Gallant contends that around that time, she had a conversation with Morimoto in which he informed her that he was making her an income partner. (Gallant Aff. ¶ 3). She contends that he also informed her that he intended to reorganize BESA and make her an equity partner with him in BESA. (*Id.*).

In March 2013, Gallant relocated from Boston to open a BESA office in New York. (*Id.* ¶ 5). Defendants contend that in April 2013 Morimoto "decided to give her a new title of 'Partner' to increase her perceived clout with the status conscious New York law firms." (Morimoto Aff. ¶ 42). Gallant contends that he provided her with business cards describing her as a "Partner," changed BESA's website to identify her as "Partner," and referred to her as a "Partner" to prospective clients. (Gallant Opp. Aff. ¶ 6). She contends that upon becoming an income partner, she took on administrative and operational responsibilities at BESA without receiving additional compensation. (*Id.* ¶ 4).

Gallant admits that she was never a shareholder in the corporation. (Gallant Dep. 342). Rather, she contends that her understanding was that she "was an income partner on a track to become an equity partner, which would in fact change the structure of the corporation at some point when I made equity status." (Gallant Dep. 342). BESA never became a partnership, and at all times remained a corporation. (Morimoto Aff. ¶ 43).

---

[3] Morimoto contends that he "had discussed with another recruiter an idea I was considering of reorganizing [BESA] into a partnership and establishing various criteria for recruiters to meet in order to become partners in the entity. I never pursued this idea further and [BESA] was never reorganized into a partnership." (Morimoto Aff. ¶ 44).

## 5.    BESA's Practice for Payment of Commissions

According to defendants, in at least some instances, placement of lateral partners by BESA may be subject to contracts that guarantee placements. (*Id.*; Gallant Aff. ¶¶ 2-3). In those cases where placements are subject to guarantees, the "commission is subject to being repaid, in whole or in part, depending on the lateral partner's continuing employment by the law firm for a specified time period." (Morimoto Aff. ¶ 4; *see* Pl.'s SMF ¶ 1). According to defendants, "if a[n] attorney whom [BESA] had introduced was hired by the law firm, and remained at the law firm at least six months, [BESA's] contingent fee would be between 10% and 30% of the attorney's annual compensation." (Morimoto Aff. ¶ 6). Defendants further contend that if "the attorney hired through [BESA's] introduction leaves the law firm, voluntarily or involuntarily, for any reason within a specified period, [BESA] will receive no fee and would have to repay its advance." (*Id.* ¶ 7).

Gallant contends that "there has never been an unsuccessful placement by [B]ESA with a client law firm." (Pl.'s Opp. SMF ¶ 2). As a result, during her time at BESA, "the company never refunded any fees paid to it by a law firm for a placement." (Gallant Aff. ¶ 6). She further contends that "payments made by the law firms were earned on the date the candidate(s) was/were hired and were payable to [B]ESA generally 30-60 days after the hire(s)." (*Id.* ¶ 5).

According to Gallant, "there were no written policies or procedures published and distributed by [B]ESA that related to the timing of the payment of commissions by [B]ESA to recruiters or to the circumstances under which portions of commissions would be repaid." (Gallant Aff. ¶ 14). "The practice was that employees would be paid their commissions, in full, upon [B]ESA's receipt of the fee from law firm clients." (*Id.*). Morimoto testified that prior to

paying a commission, BESA's practice was to make "it clear that [payment] was subject to the terms and conditions of the fee agreement that relates to the placement where they were earning the commission." (Morimoto Dep. 357).

### 6. Payment of Commissions to Gallant

During her time with BESA, Gallant placed eight partners at law firms as part of five deals. (Gallant Aff. ¶ 7). Those deals generated approximately $1.2 million in revenue for BESA. (*Id.*). BESA paid Gallant the commissions relating to these eight placements in full shortly after it received payment from the law firm client. (*Id.* ¶ 8). According to Gallant, in each instance, the payment was described as a "commission" and not an "advance." (*Id.*). She contends that at no time was she required to execute a verbal or written guarantee made on these payments or was the payment conditioned on her executing a repayment agreement. (*Id.* ¶¶ 9-10).[4]

On at least two occasions, Gallant received advances on commissions that were associated with hires that had occurred but for which BESA had not received payment. (*Id.* ¶ 11). Unlike when she received commission payments, these payments were identified as "Pay Advances" on the pay records of BESA. (*Id.* (citing Howard Dep. 76; Gallant Aff. Ex. C)). The timing of her commission payments did not change over the course of her employment with BESA. (*Id.* ¶ 14).

### 7. Debroux Placement at Reed Smith

Gallant was the BESA employee responsible for managing its relationship with the law

---

[4] Defendants dispute this and contend that the commissions were always "subject to the terms and conditions of our guarantees documented in the fee arrangements we have with our clients" as set forth in the offer of employment. (Defs.' Response SMF ¶ 9 (quoting Morimoto Aff. Ex. B)).

firm Reed Smith. (Morimoto Aff. ¶ 17). On February 5, 2013, she signed Reed Smith's

Standard U.S. Search Firm Agreement on BESA's behalf. (Morimoto Aff. ¶ 16; Defs.' SMF Ex.

D).[5] The agreement included a section entitled "Conditions for Payment," which provided as

follows:

> If an attorney placed by Search Firm resigns or if Reed Smith notifies that attorney
> of the termination of his or her employment or partnership for any reason, Search
> Firm shall refund Reed Smith according to the below schedule within sixty (60) days
> of Reed Smith's notice to Search Firm. The date on which the attorney gives oral or
> written notice of resignation, or the date on which Reed Smith provides the attorney
> with written notice of termination, shall control for purposes of determining the
> number of "full months with firm" in the schedule below.

| Full Months with Firm | Percent of Fee Refunded |
|---|---|
| 1-6 | 100% |
| 7-9 | 50% |
| 10-12 | 25% |

(Defs.' SMF Ex. D).

In March 2011, Gallant recruited attorney Michael Debroux. (Morimoto Aff. ¶ 19). At

the time she recruited him, Debroux was a partner at the Paris office of Hogan Lovells, who

focused his practice on French and EU competition law. (*Id.* ¶¶ 19-20). In September 2012,

BESA introduced Debroux to Reed Smith. (*Id.* ¶ 21). On April 2, 2013, Debroux was hired as a

partner by Reed Smith. (*Id.* ¶ 22). On June 6, 2013, Reed Smith paid BESA $104,597.50 for the

placement of Debroux. (*Id.* ¶ 23; Gallant Aff. ¶ 17; Gallant Aff. Ex. F).

---

[5] Gallant contends that "[t]he document that [d]efendants refer to as the 'Reed Smith Agreement' was never
executed by Reed Smith." (Pl.'s Opp. SMF ¶ 4). However, she does not dispute that the agreement signed by
Gallant is in fact Reed Smith's "Standard U.S. Search Firm Agreement."

Defendants contend that the payment received by BESA from Reed Smith was only an advance and was subject to being repaid in accordance with the terms of the Reed Smith agreement. (Morimoto Aff. ¶¶ 23-24).[6] Gallant disputes that assertion, contending that the Reed Smith agreement was never executed, and that in any event "the draft Reed Smith [a]greement" does not describe the payment as an "advance." (Pl.'s Opp. SMF ¶ 4 (citations omitted)). According to Gallant, "[u]nder the Reed Smith agreement, [B]ESA earned the fee on the date Debroux was hired. The amount of the fee was equal to 25% of Debrux's annual base compensation." (Gallant Aff. ¶ 16).

## 8.    Termination of Gallant

On June 5, 2013, Morimoto sent Gallant an e-mail in which he stated the following: "You are making money, not me. I cannot afford to not make money so I will run my business the way I see appropriate to change this." (Gallant Aff. ¶ 20). The following day, June 6, her employment with BESA was terminated. She was notified by e-mail from Morimoto that her "employment by [B]ESA ends as of today." (*Id.*; Morimoto Aff. ¶ 29).

According to Gallant, BESA "did not have any written policies relating to the termination of employees, separation agreements[,] or payments of commissions to recruiters after they are no longer employed by [B]ESA." (Gallant Aff. ¶ 15). However, according to defendants, "[i]n cases where recruiters' employment had ended, . . . BESA's policy was to enter into a separation agreement in which the parties identified work in process that might lead to a commission owed

---

[6] Defendants contend that if "Debroux was not continuously employed by Reed Smith through November 2, 2013, [BESA] would be entitled to receive no commission and would be obligated to repay Reed Smith the entire $104,597.50 that had been advanced by Reed Smith." (Morimoto Aff. ¶ 24). According to defendants, "[o]nly if Debroux was continuously employed by Reed Smith through April 2, 2014 would [BESA] be entitled to a full commission." (*Id.* ¶ 27).

to the recruiter and the recruiter reaffirmed in writing his or her agreement that the post-termination commission remained subject to the guarantees documented in . . . BESA's agreements with its law firm clients." (Defs.' Response ¶ 16 (citing Morimoto Aff. ¶ 31); Defs.' SMF ¶ 28).[7]

Prior to termination, Gallant told Morimoto that she would work on a separation agreement. (Morimoto Aff. ¶ 30; Gallant Aff. ¶ 21). The day after she was terminated, she received a template for a separation agreement that BESA had used in the past. (Gallant Aff. ¶ 22; Ex. G). The template included a general release of all claims in exchange for receiving payment of the Debroux commission. (*Id.*).

On June 14, 2013, Gallant filed a Non-Payment of Wage and Workplace Complaint against BESA with the Office of the Attorney General for the Commonwealth of Massachusetts. (Morimoto Aff. ¶ 35; Gallant Aff. ¶ 26). The claim was based on BESA's alleged failures to pay her (1) the Debroux commission, (2) the remaining salary she was due, and (3) all of a promised commission due. (Gallant Aff. ¶ 26). According to Morimoto, prior to filing the complaint, Gallant "had not asked the company to pay her the commissions that she now claims were owed to her." (Morimoto Aff. ¶ 36).

On August 14, 2013, two months after filing the complaint, Gallant received $52,298.75 from BESA as payment related to the Debroux placement. (Gallant Aff. ¶ 28; Morimoto Aff. ¶ 40).

**B.**     **Procedural History**

On August 27, 2013, Gallant filed the complaint in this case. The complaint alleges

---

[7] Gallant contends that there was never a uniform practice of requiring separation agreements at BESA when a recruiter's employment ended. (Gallant Opp. Aff. ¶ 11).

claims for violation of the Massachusetts Wage Act and breach of fiduciary duty against BESA and Morimoto. The complaint also alleges claims for promissory estoppel and breach of contract against BESA.

The parties have cross-moved for partial summary judgment on Count One. Defendants have also moved for summary judgment on Counts Two, Three, Four, and Six.

## II.  <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

### III. Analysis

#### A. Count One

Count One alleges that defendants violated the Massachusetts Wage Act by failing to pay Gallant commissions associated with the Debroux placement and another placement at the time of her termination in June 2013. Plaintiff and defendants have cross-moved for partial summary judgment on Count One as to the Debroux placement.

To state a claim under Mass. Gen. Laws ch. 149 § 148, a plaintiff must allege that (1) she was an employee under the statute, (2) her form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying her wages in a timely manner. *Stanton v. Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 10 (D. Mass. 2009). Under the Wage Act, "any employee discharged from such employment shall be paid in full on the day of [her] discharge." Mass. Gen. Laws ch. 149 § 148. Commissions qualify as wages under the statute "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." *Id.*; *see Weems v. Citigroup, Inc.*, 453 Mass. 147, 151 (2009). "In order to be 'definitely determined,' a commission must be 'arithmetically determinable.'" *McAleer v. Prudential Ins. Co. of America*, 928 F. Supp. 2d 280, 287 (D. Mass. 2013) (citing *Wiedmann v. Bradford Group, Inc.*, 444 Mass. 698, 708 (2005)). Commissions are "due and payable" only if any contingencies relating to their entitlement have occurred. *Lohnes v. Darwin Partners, Inc.*, 2002 WL 31187688, at *3 (Mass. Super. Ct. July 23, 2002); *accord Cumpata v. Blue Cross Blue Shield of Mass, Inc.*, 113 F. Supp. 2d 164, 167 (D. Mass. 2000).

Here, there is no dispute that Gallant was an "employee" within the meaning of the

statute.  There is likewise no dispute that she was paid the commission for the Debroux placement, and that payment occurred on August 14, 2013, approximately ten weeks after she was terminated on June 6, 2013.  The sole issue appears to be whether that commission was both "definitely determined" and "due and payable," and therefore a "wage," at the time her employment was terminated.

Gallant appears to contend that the commission was "definitely determined" because BESA sent an invoice to Reed Smith in the amount of $104,597.50, and payment on that invoice was received by BESA from Reed Smith on June 6, 2013.  She contends that the commission was "due and payable" upon her termination because "there were no written policies or procedures published and distributed by [B]ESA that related to the timing of the payment of commissions by [B]ESA to employees nor to the circumstances under which portions of commissions would be repaid," and that as a result, the Debroux commission had become "due and payable" on the day she was terminated.  She cites to *McAleer*, 928 F. Supp. 2d at 289, in support of her position.

In *McAleer*, the court explained that "[w]hen a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan[;] however, when the plan does not specify, courts generally consider that the employee earns the commission and it becomes due and payable when the employee closes the sale, even if there is a delay in actual payment on the sale."  *Id.* (citations omitted).  Here, although there was no company-wide written compensation plan, the terms of plaintiff's compensation were specifically set forth in her contract with defendants.  Therefore, the Court will look to the terms of that contract to determine whether the payment was "definitely determined" and "due and

payable."

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir. 1981) (citing *Freedlander v. G. & K. Realty Corp.*, 357 Mass. 512, 516 (1970)); *accord Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992). When a contract is unambiguous, it must be enforced according to its terms. *Edmonds*, 642 F.2d at 881. A triable issue of fact exists only if the contract is ambiguous. *Id.*

It appears to be undisputed that the May 5, 2010 e-mail from Morimoto to Gallant sets forth the original terms of her employment with BESA. The e-mail states that "commission is subject to the terms and conditions of our guarantees documented in the fee agreements we have with our clients." (Defs.' SMF Ex. B). That term is unambiguous: any commissions that Gallant earned were subject to the terms and conditions of any fee agreements BESA had with its clients. If the "subject to" term from the May 5, 2010 e-mail was still operative at the time of her termination, Gallant's commission on the Debroux placement would be "subject to" the terms of any underlying fee agreement, and therefore not "definitively determined" and "due and payable."

Defendants contend that the Debroux placement was subject to the Reed Smith agreement, and the fee BESA received was contingent on the period of time that Debroux stayed with Reed Smith. Defendants therefore contend that Gallant's commission could not be "arithmetically determinable" until the various benchmarks in the Reed Smith agreement had been met. Because the final benchmark was April 2, 2014, and Gallant was terminated on June 6, 2013, no amount could be "definitely determined" on the date of her termination; and because

her right to any commission on the Debroux placement would have been undetermined until November 2, 2013, no commission would have been "due and payable" on the date of her termination.

Gallant attacks that conclusion on multiple fronts. First, she contends that there was no contingent fee agreement with Reed Smith. Specifically, she argues that the written agreement with Reed Smith (which she refers to as a draft) is not valid because it was never signed by a representative of Reed Smith.

It is undisputed that the document at issue is a form agreement created by Reed Smith and sent to BESA. When Reed Smith provided it to BESA, that act constituted an offer. The representative of BESA who signed it was, ironically, Gallant herself. When Gallant signed it on behalf of BESA and sent it back, that act constituted an acceptance.

It is true that the document is not countersigned by Reed Smith. However, the fact that the agreement is not signed by one party does not necessarily make it invalid. Although it is true that a party generally executes a written contract with a signature, "a signature is not always necessary to create a binding agreement." *Federal Deposit Ins. Corp. v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1069 (D. Colo. 1997). Mutuality of assent may be proved in a variety of ways. *Id.*; *see also Haufler v. Zotos*, 446 Mass. 489, 499 (2006) (recognizing that party assented to escrow agreement by holding deeds, mortgage, and sum of money even though he did not sign agreement); *Samincorp South American Min. & Mer. Corp. v. Lewis*, 337 Mass. 298, 302 (1958) (rejecting defendants' objection that contract was not effective because they did not sign it where their conduct showed they accepted its terms). Furthermore, BESA and Reed Smith appear to have performed in accordance with the terms of the agreement. Gallant has submitted no

evidence, other than the absence of a Reed Smith signature, to suggest that a contract was not formed. Accordingly, the written agreement sets forth the terms of the contract between BESA and Reed Smith, and that contract calls for, among other things, the repayment of the fee if certain contingencies occur.

It is undisputed that Gallant's commission was calculated as a percentage of the fee received by BESA from the law firm—in this case, Reed Smith. Because the fee BESA received for the Debroux placement was contingent on the period of time that Debroux stayed with Reed Smith, Gallant's commission could not be "arithmetically determinable" until the various benchmarks in the Reed Smith agreement had been met (or not).

Gallant, however, further contends that her compensation arrangement had been changed, and therefore the commission associated with the Debroux placement was not "subject to" the guarantees set out in the Reed Smith agreement. She appears to contend that two changes—the modifications to the terms of her compensation made in January 2012 and her becoming general counsel in 2011—eliminated the "subject to" term from her contract. She does not argue that the parties ever specifically agreed to eliminate that term; rather, she appears to contend that the elimination of the term was a natural consequence of changes to her job title and responsibilities.

"Under Massachusetts law, the parties to a contract must agree to a modification." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 9 (1st Cir. 2003). To support a finding that changes to her job title and responsibilities changed the terms of her contract, Gallant cites to *F.A. Bartlett Tree Expert Co. v. Barrington*, 353 Mass. 585, 587-88 (1968). In *F.A. Bartlett*, an employer sought to enjoin a former employee from violating a restrictive covenant in an employment contract. *Id.* The Massachusetts Supreme Judicial Court found that the restrictive

covenant contained in a 1948 contract was no longer in effect. *Id.* The court refused to enforce the restrictive covenant in light of the parties' conduct, including changes in job terms and title that occurred in 1960 and 1965. *Id.* Subsequent cases that have cited *F.A. Bartlett* have cited it as standing for the proposition that "Massachusetts courts have consistently refused to grant injunctive relief or otherwise enforce restrictive covenants where such covenants were entered prior to changes in the employment relationship." *Iron Mountain Information Management, Inc. v. Taddeo*, 455 F. Supp. 2d 124, 133 (E.D.N.Y. 2006) (collecting cases).

Gallant thus argues, in substance, that the various changes in her job title and responsibilities, without more, modified the terms of her employment contract (in a manner favorable to her, by eliminating the "subject to" provision). But no Massachusetts court appears to have ever applied *F.A. Bartlett* outside the context of a restrictive covenant; certainly Gallant has not cited any such cases. This Court is not empowered to expand Massachusetts employment law, and in any event there is no apparent reason, in law or policy, why such a potentially sweeping change should be adopted.

Next, Gallant contends that a January 10, 2012 e-mail is evidence that the terms of her contract had been modified to eliminate the "subject to" term. There are multiple problems, however, with that argument, beginning with the fact that she wrote the e-mail herself. The e-mail therefore appears to be hearsay. Even accepting the e-mail on its face, it states that "Phil [Morimoto] and I have agreed that my payroll information will change in 2012 to the following," and then recites a salary term, a health-care reimbursement term, and "25% on my deals for each side." (Gallant Aff. Ex. B). It thus purports to show a "change" in "payroll information," not a description of every term that remained unchanged, or every detail of her employment contract.

For example, it makes no reference to the fact that she was an employee at will; surely that term had not been casually eliminated in January 2012. The elimination of the "subject to" requirement—which would require BESA to pay her commission, even if it had to pay the fee back—would have been a very significant change, but it is not listed among the changes to the contract. Furthermore, and in any event, there is no evidence that Morimoto agreed to the purported modification, or otherwise assented to a new arrangement.

Finally, Gallant contends that the parties' course of conduct—specifically, BESA's payment practices—is evidence that her entitlement to commissions was not "subject to" any contingencies. Evidence of the actions of the parties after execution of the contract may be relevant to show a modification, whether written or oral, of an integrated agreement. *John Beaudette, Inc. v. Sentry Ins.*, 94 F. Supp. 2d 77, 139 (D. Mass. 1999) (citing *Cambridgeport Sav. Bk. v. Boersner*, 413 Mass. 432, 439 (1992)). Mutual agreement on modification may "be inferred from the conduct of the parties and from the attendant circumstances." *Cambridgeport*, 413 Mass. at 439 (citing *First Pa. Mortgage Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 625 (1985)).

During her tenure with BESA, Gallant placed eight partners at law firms as part of five deals (apparently not including the Debroux placement). (Gallant Aff. ¶ 7). BESA paid her the commissions relating to these eight placements in full shortly after it received payment from the law firm client. (*Id.* ¶ 8). In each instance, according to Gallant, the payment was described as a "commission" and not an "advance." (*Id.*). Defendants do not contend that Gallant ever had to pay back any of these commissions. However, Gallant contends that "there has never been an unsuccessful placement by [B]ESA with a client law firm." (Pl.'s Opp. SMF ¶ 2). It appears to

be undisputed that if Gallant had not been terminated on June 6, 2013, she would have received the $52,298.75 within the first two subsequent payroll periods.  (Gallant Aff. ¶ 14).

One problem with Gallant's position is that she has put forth no evidence as to whether those eight other placements involved contingent arrangements.  If those eight placements were not subject to any contingencies, they are largely irrelevant.  And even if they were subject to contingencies, the characterization of her payments as "commissions" rather than "advances" is insufficient evidence, without more, that the employment agreement had been modified such that she could keep the entire amount even if BESA had to repay the fee.[8]

Another problem is that Gallant has put forth no evidence of changes as to how she was paid commissions during the course of her employment.  To the contrary, she explicitly states that "when a commission was paid to [her] didn't change during [her] employment."  (Gallant Aff. ¶ 14).  Therefore, it is unclear, to say the least, how the parties' course of conduct shows a contract modification when that conduct did not change throughout the entire course of her employment.

In short, there is not sufficient evidence in the record from which a reasonable jury could find a modification of the "subject to" term of Gallant's contract.  Accordingly, the commission payable to Gallant after the Debroux placement was neither "definitely determined" nor "due and payable," and therefore not a "wage," at the time her employment was terminated. Defendants' partial motion for summary judgment as to Count One will therefore be granted, and

---

[8] Morimoto testified that prior to paying a commission, BESA's practice was to make "it clear that [payment] was subject to the terms and conditions of the fee agreement that relates to the placement where they were earning the commission."  (Morimoto Dep. 357).  However, Gallant appears to contend that when she received commission payments, BESA never followed this practice.  Accordingly, the Court will not credit Morimoto's statement for purposes of deciding the present motions.

plaintiff's cross-motion will be denied.

**B.     Count Two**

Count Two alleges a claim for breach of fiduciary duty against both defendants.  A claim

for breach of fiduciary duty consists of four elements: (1) existence of a fiduciary duty; (2)

breach of that duty; (3) damages; and (4) a causal relationship between the breach and the

damages.  *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999).

Gallant contends that defendants owed her a fiduciary duty because she was a partner in a

partnership with them.  It is unclear from Gallant's allegations what she contends were the exact

contours of the partnership.  She contends that "at the time of her termination, she was an income

partner of Morimoto and through Morimoto a de facto income partner in [B]ESA."  (Pl.'s Opp.

3).  It is undisputed that BESA is, and has always been, a Massachusetts corporation, and that

Morimoto is its sole shareholder.  (Morimoto Aff. ¶¶ 1-2).

Pursuant to Massachusetts law, a partnership is defined as "an association of two or more

persons to carry on as co-owners a business for profit."  Mass. Gen. Laws ch. 108A § 6.  To

determine whether a partnership exists, courts examine multiple factors, including "whether

there is '(1) an agreement by the parties manifesting their intention to associate in a

partnership[,] (2) a sharing by the parties of profits and losses, and (3) participation by the

parties in the control or management of the enterprise.'"  *Kansallis Finance Ltd. v. Fern*, 40 F.3d

476, 478-79 (1st Cir. 1994) (quoting *Fenton v. Bryan*, 33 Mass. App. Ct. 688, 691 (1992)).

Gallant contends that although BESA was organized as a corporation, Morimoto intended to

convert BESA to a partnership.  In support of that argument, she points to e-mails from

Morimoto to Kate Gascoigne where he discusses the idea of reorganization.  However, it is

undisputed that BESA to this day remains a corporation. There is no evidence that Morimoto in fact did reorganize BESA.

Gallant further contends that Morimoto promised to make her an "income partner," provided her with business cards identifying her as a "partner," changed the website to identify her as a "partner," and held her out to clients as a "partner." However, under Massachusetts law, the fact that parties referred to themselves as partners is not enough to create a partnership. *Martin v. Stone*, 332 Mass. 540, 546 (1955) ("It is not enough that the parties referred to each other as partners."); *Cardullo v. Landau*, 329 Mass. 5, 9 (1952) ("Notwithstanding that they may have referred to their relationship at the beginning as a partnership, the gist of the arrangement as finally entered into was that the plaintiff was to become an employee of the corporation with the right to purchase one-half of its stock out of profits."); *485 Lafayette Street Acquisition, LLC v. Glover Estates, LLC*, 2012 WL 3216762, *10 (Mass. Super. Ct. May 16, 2012) ("The plaintiffs' main argument appears to be that the parties frequently referred to themselves as partners. That is insufficient to form a partnership."); *Gemini Investors, Inc. v. Ches-Mont Disposal, LLC*, 629 F. Supp. 2d 163, 167 (D. Mass. 2009) ("[U]se of the verb 'partner' alone does not suffice to establish a partnership."); *In re Medallion Realty Trust*, 103 B.R. 8, 12-13 (Bankr. D. Mass. 1989) ("Parties cannot establish a partnership through mere intention and reference to themselves as partners.").

Gallant points to no evidence of an agreement by the parties manifesting their intention to associate in a partnership. Among other things, she points to no evidence that she shared in profits and losses, or that she participated in control or management of BESA. The only evidence that Gallant points to is that she received the title of "partner" and served as an income

partner. Her role as an income partner is "more akin to [a] salaried employee[] than [an] actual partner[]." *See Bress v. Weiser LLP*, 2007 N.Y. Misc. LEXIS 9220, *4 (N.Y. Sup. Ct. May 25, 2007) ("The customary indica of equity partnership include profit and loss sharing, control over the partnership affairs, contribution to capital, and possession of an ownership interest. Income partners do not possess ownership and control." (citations omitted)); *see also Davis v. Loftus*, 334 Ill. App. 3d 761, 769-71 (2002) (finding that income partners under a certain partnership agreement did not qualify as partners within meaning of the Uniform Partnership Act).

In summary, there is insufficient evidence that a partnership existed between Gallant and Morimoto, and therefore insufficient evidence of a fiduciary relationship. Accordingly, defendants' motion for summary judgment as to Count Two will be granted.

### C. Counts Three, Four, and Six

Counts Three and Four allege claims for promissory estoppel arising out of an alleged promise of long-term employment. Count Six alleges a claim for breach of contract arising out of an alleged agreement for long-term employment.

To prove a breach of contract under Massachusetts law, a plaintiff must show "that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted); *accord Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999). "Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing [a] promise would serve the interests of justice." *Steinke v. Sungard Fin. Sys.*, 121 F.3d 763, 776 (1st Cir. 1997); *see also Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995) ("[A

promissory estoppel] action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.").  In order to establish a claim of promissory estoppel under Massachusetts law, a plaintiff must show that (1) defendant made a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.  *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004).  An essential element for both a claim for breach of contract and a claim for promissory estoppel is an unambiguous promise that "include[s] enough essential terms so that a contract including them would be capable of being enforced."  *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71 (D. Mass. 2004) (quoting *LaChance v. Baybank Norfolk*, 1994 WL 878761 at *9 (Mass. Super. Ct. 1994)); *see also Rhode Island Hosp.*, 419 Mass. at 848; Williston on Contracts § 4:21 (4th Ed. 2015).

Under Massachusetts law, "[a]s a general rule, where an employment contract, be it expressed or implied, contains no definite period of employment, it establishes employment at will."  *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 9 (1988).  Here, there is no dispute that Gallant was originally hired as an at-will employee.  (Gallant Dep. 86).  She contends that at some point in her employment, her status changed so that she was promised long-term employment.

Gallant does not identify a specific promise of long-term employment.  Instead, she contends that in September or October 2012, Morimoto gave her the title "income partner" and allegedly indicated that he intended to reorganize BESA and make her an equity partner; she

argues that he thereby promised her long-term employment. (Gallant Opp. Aff. ¶ 3). Gallant

contends that Morimoto told her that he wanted to work with her in the long term, he wanted her

to stay and help him build BESA, and he wanted her to consider herself more than just an

employee at BESA. (Gallant Dep. 118). But none of those statements or facts amounts to (or,

indeed, comes close to) an unambiguous promise.[9] "'[A] mere expression of future intention . . .

does not constitute a sufficiently definite promise to justify reasonable reliance thereon,' nor

does 'a statement that merely gives rise to a hope or expectation on the part of the promisee.'"

*Engler v. C.R. Bard, Inc.*, 1997 WL 136249, *5 (D. Mass. 1997) (quoting *Santoni v. Federal

Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982); *Kiely v. Raytheon Co.*, 914 F. Supp. 708,

712 (D. Mass. 1996)).

No reasonable jury could conclude based on these facts that defendants promised Gallant

long-term employment. Therefore, any reliance on long-term employment that is based on the

series of events that changed Gallant's employment is unreasonable as a matter of law.

Accordingly, the motion for summary judgment will be granted as to Counts Three, Four, and

Six.

IV.   **Conclusion**

For the foregoing reasons,

1.       defendants' motion for partial summary judgment as to Count One, and summary

judgment as to Counts Two, Three, Four, and Six, is GRANTED, and

2.       plaintiff's motion for partial summary judgment as to Count One is DENIED.

---

[9] To the extent that Gallant relies on conversations between Morimoto and Kate Gascoigne (such as the September 25, 2012 e-mail), such reliance is unreasonable. Gallant was not included in these conversations, and thus could not have relied on their content. However, and in any event, these conversations do not appear to express a promise, but rather, appear to indicate an expression of future intention. (*See* Gallant Opp. Aff. Ex. A).

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV

Dated: June 12, 2015

United States District Judge